Okay. It's unusual. Council, will you step up, please? Good morning, Your Honors. I'm Miles Kelleher on behalf of the people. We don't have anyone from Kathleen Zellner here. All right. All right. By process of elimination, you are? My name is Nicholas Curran, and I represent the defendant appellant, Steven Young. All right. And keeping in mind that we have read the briefs, Mr. Curran, how much time would you like? I think 15 minutes, Your Honor, with five for rebuttal. And Mr. Kelleher? I would request approximately 20 minutes, please. All right. Please keep in mind we have read the briefs. All right. Mr. Curran, whenever you're ready. May it please the Court, Counsel? Again, as I mentioned, my name is Nicholas Curran, and I represent the defendant appellant, Steven Young. Now, I have raised five issues in our brief, all of which I submit require some form of relief on Mr. Young's behalf. I'm more than happy to discuss any of those or answer any questions the Court may have. I probably won't be able to get to all of them today. But again, if there's anything specific the Court would like to address, I'm more than happy to discuss any of those issues. The first issue I would like to address is the sufficiency of the evidence against the defendant as to the alleged victim whose initials are B, A. Of course, we all know that due process requires the State to prove a defendant's guilt beyond a reasonable doubt. And in addressing a challenge to the sufficiency of the evidence on appeal, this Court asks whether the trial evidence, viewed in a light most favorable to the State, supports a finding of guilt beyond a reasonable doubt. Now, to provide a little context for this issue, the evidence at trial was that the defendant lived on a two-floor apartment. On the first floor was a front room with a television, a computer room or an office area, and then a kitchen. And then on the second floor was the defendant's bedroom, a guest bedroom, and a bathroom. The evidence at trial was also that B, A. and her family lived in the unit below the defendant and that the defendant was their landlord. So B, A. testified at trial that she went up to the defendant's apartment and that she was in the computer room when the defendant came into the room and essentially fondled her with his hand on top of and underneath her clothing. She testified that there was no one else in the apartment at the time that this took place. She then testified that on one occasion something different happened, where the defendant took her up to his bedroom on the second floor and committed what I would characterize as more extreme forms of sexual abuse, including penetration or contact between his penis and her genitalia and her buttocks. And she also testified that he made contact with her genitalia with his mouth. Now, the problem with B, A.'s trial testimony is that in almost every material respect, it conflicts with statements she made before trial, in particular during her videotaped forensic interview, which was conducted shortly after her initial outcry. Well, it didn't conflict. She consistently said to her sister, to her mother, to the interviewer, and at trial, that the defendant touched her over and under her clothing on her private part. Right? That was her consistent testimony. Yes, Your Honor. And that's the conduct for which your client was convicted. Right? That is correct, Your Honor. However, that is the only point of similarity I submit between the two statements. For example, during the forensic interview, B, A. said that she went up to the defendant's apartment with three other children, one of whom was her older sister. Right off the bat, that's different from what she testified to at trial, which is that the abuse took place while no one else was in the apartment. Okay. How old was B, A. when she was abused? She was seven. Seven. Okay. Okay. She then told the forensic interviewer that she was in the front room watching television when the defendant came in and fondled her, while the three other children were in the adjacent room with the computer at the time that the alleged abuse took place. Again, that is completely different from what she testified to at trial. The forensic interview carried on for an extended period of time, during which she denied that any other conduct or contact occurred. And then after what I would submit was improper and coercive leading by the interviewer, described another act of contact or penetration where the defendant touched his penis to her buttocks area. And again, your client was not convicted for that conduct. I understand, Your Honor. I think the question, though, is whether or not all these discrepancies and all these conflicts between what she testified to at trial and what she said before trial render her testimony about the charged conduct and the conduct for which the defendant was convicted unreliable to the point that it cannot sustain a finding of guilt beyond a reasonable doubt. When her mother asked her when she first reported to her this conduct, how many times has it occurred, she said, Mommy, I don't count. She did say, well, that's according to what the mom testified. Now, she never testified at trial that any of this abuse took place anywhere else in the apartment. During her forensic interview, she testified that or, excuse me, she stated that. But what's the relevance? I mean, that is irrespective of the touching of what she was convicted of. Correct. And I think that this – I mean, the fact that there are always some – not always, but many times, in many cases, there's some inconsistencies. Particularly, we have a – she was seven at the time. She was a few years older at the time of testimony. The fact that these peripheral issues may or may not have been exactly as stated in the forensic interview, why should that be used to totally reverse the decision here? Your Honor is touching on what is the key, I think, question. And it is a problem that is present in almost all of these kinds of cases. There is no question in my mind, and I submit, that if B.A. were an adult and testified as she did, this Court would have serious pause about the validity of the conviction. And part of the basis for that contention is, for example, the Cowan case that we cite in our brief. Now, that is a case where you have an adult victim alleging sexual assault. What she told the police conflicted with her trial testimony in terms of the location of the abuse or the alleged assault within the house, how the alleged assault started, and the contact or the physical – the specific allegations. But cases involving adults whose trial testimony is greatly at odds with previous statements are not this case. This is a seven-year-old. Correct. And my question is, well, here's what I would say. The standard of proof to which the State is held is the same no matter the source of the evidence on which it relies. We can all agree on that. So the standard is proof beyond a reasonable doubt. So my question then is, the only way you get around this problem is to assume that a child is unlikely to fabricate or unreliably report allegations of abuse. And there is certainly nothing in this – there's no evidence in this record that would support that assumption. And I have yet to hear a court cogently explain why we disregard inconsistencies and deficiencies, quite frankly, in a witness's testimony simply because they're a minor that we would pay very close attention to if the witness were an adult. Again, I understand why a child might be more prone to the foibles of memory, why they may have a more difficult time consistently explaining what has happened to them. But if anything, that moves us further away from proof beyond a reasonable doubt, which is, again, the standard that is imposed. Okay. The next issue I would like to address is related, and that's the fourth issue in our brief, and that is that the defendant's right to due process was violated where the trial court misapprehended the evidence in rendering judgment as to the charged offenses involving B.A. Now, the specific statement or the issue that we have here is that during her rendition of judgment, the trial court stated that the child advocacy center interview corroborated B.A.'s trial testimony. And for all the reasons I've laid out before, and if you watch the video, that is simply – it's simply untrue. It's not true. It's not accurate at all. In almost every material respect, there were things that she said in that forensic interview that conflicted with her trial testimony. Now, if the trial court had said, you know, I acknowledge that there were discrepancies between the video and what she testified to at trial, but nevertheless I saw her testify, I view her as being credible, I, you know, can reconcile those discrepancies, then we would not have an issue. But the problem here is that the defense was based entirely on the fact that you have no physical evidence, you have no third-party witnesses to the alleged abuse, and then, of course, that the alleged victim's statements are completely contrary to what she testified to at trial. And here the judge either misapprehended that or forgot, quite frankly, what is in the video. There's no way you can look at that video, watch that video, and say, oh, well, it just supports what she said at trial, unless you're assuming the allegations to be true, and then you're viewing the video through that prism, and then only then can you reconcile these discrepancies and set them to the side and say that one necessarily supports the other. It's just simply not true. The next issue I would like to briefly touch upon is the first issue in the brief, and that relates to the trial court's abuse of discretion in admitting B.A.'s forensic interview, pursuant to Section 115-10 of the Code of Criminal Procedure. Our argument in this regard is based on the manner in which the interview was conducted, the forensic interview. We lay this out in detail. It gets into a lot of minutia as to the course of the interview. This is a terrible- The interview at the beginning was different. As it went on, there seemed to be some change in the manner of questioning. Your Honor, I would agree with that. I think it went from, I'm just going to ask you and ask open-ended questions and see your response to, well, now I've heard that other things happened to you, so why don't you tell me about that? She said that repeatedly. And repeatedly, B.A. said, I don't know what you're talking about. Can you tell me what these other people have said? And she said, well, no, I can't do that. But if you don't tell me the truth, then the people I work with and work for will not be able to help you. That's a terrible interviewing thing. And again, Mr. Young was not convicted of any of the conduct that came out in that half of the interview. That is correct, Your Honor. But, again, I think that you have to take a more broad look at the evidence and the effect that it's going to have on the trier of fact. Well, I don't think we need to here. I mean, we have a judge. I think a judge can separate those two. You would think. However, the judge said that in rendering judgment that the forensic video corroborated what she testified to. Well, but you're talking about the first half rather than the second half. And the first half did. And that's what we're talking about here. Well, I would disagree with that because, again, she described during her forensic interview that this touching occurred in the front room with the television while she was watching television while there were three other children in the apartment in the next room in the office, which is completely different from what she testified to at trial, which is she went up to the apartment on her own, was in the computer lab by herself when the defendant came in, and the abuse occurred. The judge accepted her testimony, found her to be credible. And according to what she stated in rendering judgment, she relied on the video in making that, in drawing that conclusion. And that would be the first half because the second half is. But I think, again, Your Honor, it's only human nature that if you have allegations of incredibly serious abuse spanning over many occasions, it's going to affect the way you look at the defendant with regard to each specific. It's not as though the judge or any trier of fact could reasonably separate out all of these things and consider them in isolation. Certainly the testimony and the interview and the statements that B.A. gave regarding the other abuse played into her assessment of, well, I'm sure this guy must have done something, so I'm going to convict him of this, which is really the sense you get when you read the judge's rendition of judgment. I think it's a somewhat related issue, which is the last issue in the brief, which is the sentencing issue. So essentially what we argue there is that the trial court committed plain error by considering the defendant's refusal to admit guilt. No, failure to express remorse.  It wasn't a failure to admit guilt. It was a failure to express remorse. I disagree. I disagree. The exact statement that the court said was, Mr. Young, you're going to have to own what you did one day. But it wasn't today, unfortunately. Had you stood there and owned it, your sentence would have been somewhat less. Owned it in the sense of, I'm sorry. Defendants say that all the time in allocution. I'm sorry. They don't have to admit guilt. I'm sorry for the victim. And that's how I read what the trial judge was saying. He came out, he chose to speak in allocution. He didn't have to. And what he chose to say was, the entire judicial system is corrupt. And everybody's lying. And none of it is my problem. Your Honor, if in fact he is innocent, and I don't think that this court can attribute infallibility to our justice system. So let's assume for a moment that he is innocent. And he's been wrongfully convicted of having committed these offenses. I think it's entirely understandable for especially a lay person to say, I don't understand why I've been convicted. There's no physical evidence. Nobody else has corroborated these allegations. And what the witnesses or what the alleged victims are saying is completely inconsistent. I think it's completely reasonable for him to have reacted the way that he did. In terms of him not expressing remorse, I don't understand the concept of expressing remorse for something that you didn't do. I suppose he could have said, you know, I'm very sorry that the victims feel this way. He tells the court neither victim suffered any emotional injuries from what happened to them. From his perspective, he's standing by his proclamation of innocence. And we have cases that are replete with that stand for the proposition that you cannot automatically impose a more harsh sentence simply because the defendant refused to admit guilt, which is what the trial court wanted him to do. And what's especially problematic for criminal defendants is you're in a catch-22, because there's case law that says that, well, if the defendant chooses to not say anything, that can be held against them as indicative of a lack of remorse. Actually, it's the opposite. If you don't – if you choose not to speak in allocution, which a defendant has the right to do, the court can't hold that against him. But if he chooses to speak and chooses, as Mr. Young did, to say these victims didn't suffer any emotional harm, there's no evidence against me, then the court can take that into account. It's appropriate. Your Honor, again, I disagree with that assessment of what precedent stands for. And, in fact, there are – there have been cases that say that where a defendant chooses to remain silent during allocution, that can be construed as a lack of remorse that can be held against them. We don't have that situation. That's correct. But if the defendant had said nothing, he could be – That's not what happens in those cases. But if he says something – So what then should he have done? Should he have said, I'm sorry for – That's not the issue before us. The issue before us is what he did say and whether the courts have said in the past, and we have, that that lack of remorse can be taken into account. Right? That's what the case law says. So you're asking us to reverse all that case law? No. So the Ward case, which I believe is the main case to track, that's the Illinois Supreme Court case that I feel like is most pertinent, that case holds that a defendant's continued protestations of innocence and lack of remorse must not automatically be applied as aggravating factors. And the court says that, you know, lack of remorse is connected to rehabilitation potential. So the problem here is that the court, even after the defendant allocuted, said the potential for rehabilitation is great, and that is supported completely by the record. Here we have a defendant who was gainfully employed, had no criminal record whatsoever, no history of any substance abuse or alcohol abuse, had a loving, supportive family, has a mom who's a – And what was the range of sentence? The range of sentence was for a Class I felony, four to 15 years. He was sentenced to two five-year consecutive terms. So, again, though, you have to look at what the judge said, and she explicitly stated if you had owned it, your sentence would have been less. And that is just an – it's an impermissible factor in sentencing. The last issue that we raise in our brief relates to the allegations involving the minor whose initials are D.J. And, again, the same standard applies with regard to the evidence involving him. You know, what I'll say about the evidence involving D.J. is that the scenario of events to which he testified was just so completely unrealistic. He essentially testified that while he was in the shower, the defendant – Well, we know the story, but the judge found them very, very credible. She did, but at some point there is a – it's not as though a trial judge's finding of credibility is immune from appellate review. If the facts and the record do not support a finding of credibility, this court has the authority to reverse a finding of credibility. So, your theory is D.J.'s mother prompted him, and maybe B.A., to make this up about your client because she was behind in her rent. And so D.J. is going to claim that Mr. Young assaulted him. If you're going to make up a story, why would you say you're on the phone on a landline in the shower? Why would you include that detail? I have no idea, Your Honor, and it's not – Wouldn't that have been obvious to the trial judge? It's – Your Honor, respectfully, I think that she had her mind made up about the case before the case even started. So we should define for the record that she had her mind made up, and that's why we should reverse. And, Your Honor, there's a lot that goes into this, but part of it is her assessment of the evidence and rendering judgment, her complete failure to acknowledge that, yes, there are problems here with regard to the testimony and some of the specifics that the alleged victims testified to. If she had acknowledged those things and still adjudicated him guilty, then I wouldn't have a basis to argue that there was a flaw in the mechanism of the defendant's trial that resulted in his convictions. But the issue here is the State's burden to prove the defendant guilty beyond a reasonable doubt. I don't necessarily know why they would fabricate the allegations. Why would anybody do that? But people do. It happens. And in this situation, you have a child who – or a young man who's 13 years old. And they go to the hospital that evening, and they see a doc and everything else. I mean – He said that he was anally raped to the point that he was walking with a limp. And when he was examined a few short hours later, there was absolutely no evidence of any kind of injury. Right. He was in the shower, and there may not have been. But, again, you're saying that this whole thing is because of a lateness in rank. I mean, that's a pretty far-fetched story to have to come up with because of lateness in rank. It's not the defendant's obligation to prove his innocence. No. We don't know why. They offered the defense a trial. The judge rejected that, though. And I don't see why we don't – why we – on what basis we won't accept that. Because the presumption is that the defendant is innocent. That's how you start the trial. Right. And she found them – she believed the victim here. Right. And so what we've done here in the appeal is we've appointed – or we've pointed out all the ways in which D.J.'s testimony is just fatally unrealistic. To be on the phone with someone during the course of an anal rape and not say anything, then you don't contact the witness, investigate the person he was on the phone with, call them to corroborate, yeah, I was on the phone with him when the defendant came in and I overheard something happen. I mean, he also indicated that the defendant took photographs of him with his phone. No photographs were ever produced at trial. Again, you have the lack of any injuries consistent with his claim that he was injured to the point to where he couldn't walk after the encounter. He did say he couldn't walk. He said he could only walk with a limp. He walked with a limp. So, again, and I understand where the court is coming from. And my position is that based on the unique facts of this case, there are just too many problems to sustain the defendant's convictions beyond a reasonable doubt. So with that, I appreciate the Court's attention and I'll wait for the vote. Okay, thank you, Mr. Curran. Mr. Kelleher. May it please the Court, Counsel. I'll begin by addressing the statements that VA made at the Children's Advocacy Center. First of all, this issue is forfeited and the defendant can't satisfy the plain error rule. And that's because the time, contents, and circumstances of these statements provided sufficient safeguards of their reliability. Before VA even was brought to the Center, she had already made two outcries. She had made an outcry to her older sister in November and she had made an outcry to her mother in January. In both of those instances, VA stated that the defendant, who was the family landlord, had inserted his finger into her front private part. That's the term that VA used to describe her vaginal area. During the interview itself, she described how the landlord inserted his finger into, down her pants, above the, outside the line, inside the line, outside the hole, inside the hole. And she said it happened lots of times. We have a situation where defendant was a trusted landlord of the family. He invited VA and these other kids to go into his upstairs apartment. He provided a friendly environment where they could use his computer, they could watch his TV. Essentially, he was grooming VA. And he bought her a very expensive Christmas gift one year and the other kids got something not nearly as expensive. That's absolutely correct, Your Honor. And we can reasonably infer that he was attempting to buy her silence. He had instructed her, don't tell anyone, this is our secret. When VA made the outcry to her older sister, her sister specifically instructed VA, don't go there alone. So this suggests that this was happening when no one else was around. And when she... Ms. Curran says in the interview, at some point VA says her siblings were right in the next room. And so this is inconsistent with the notion that she was up there by herself. Well, the defense is trying to bring out these inconsistencies to suggest that somehow VA's testimony is incredible. But what we do know is that she testified during the forensic interview that this had happened lots of times. She testified during trial that it had happened on a number of occasions. And we know that this was defendant's apartment. He was in control. He could decide what room this occurred in. He could decide when it occurred. Sometimes it occurred on the first level of his apartment. Sometimes it occurred up in the bedroom of his apartment. But what we do know is defendant wanted to keep this a secret. He specifically instructed VA, do not tell anyone. He told her... And VA knew that defendant had a gun. So VA was scared to say anything. I don't think she even knew what was going on because of her young age of seven and defendant being 31. But VA was reluctant to tell anyone about this. When she did make an outcry to her sister, she made an unusual statement. But she was only seven, saying she liked defendant. Well, she said, Steve likes me. This is what she said. Yes, and she liked Steve. And her sister, being older, was shocked. What do you mean? This is a grown man. Why would you say something like that? And then only at that point did VA explain what was going on. But even her older sister was afraid to tell the parents. But when this court does assess the sufficiency of the evidence and the statements made at the forensic interview, it's important to consider that, as was already previously noted, as to VA, defendant was only found guilty of count one. That was predatory criminal sexual assault of a child based on defendant inserting his finger into VA's vagina. And that was covered during the first portion of the interview. And the defense doesn't complain about that portion of the interview. They complain about the interview taken as a whole. That's a response to the fact that we should consider what happened the second half of the interview, even though that testimony isn't relevant to the conviction. Well, first of all, I agree that it's not relevant to the count that defendant was found guilty of. But even if this court does consider it, it was proper. Lauren Glazer was a trained professional who was following the protocols. She never put words in VA's mouth. At one point, yes, she does say, the people I work with are here to protect you, but you have to tell the truth. But it's important to consider that she told that statement to VA after VA had told Glazer that she was afraid of defendant. So we have a seven-year-old child being interviewed telling the forensic interviewer that she's afraid of defendant. So naturally, the interviewer was simply trying to reassure VA, make her feel comfortable, make her feel like she was in a safe environment where she could tell the truth about what was going on. And there's nothing wrong with telling a young child to tell the truth. That's the whole purpose of the interview, to find out what the truth was. And so you have to look at all the circumstances of this interview, the circumstances that led VA to the Child Advocacy Center in the first place, the contents of VA's statement, which were consistent with her trial testimony as to the defendant inserting his finger into her vagina. And I would also point out that the terminology that VA used during the interview was consistent with what you would expect from a seven-year-old. She used terms like front private part, she described defendant's penis as his thingy, she described how defendant shouldered his thingy, how he shook his thingy, and white stuff came out, and he put the white stuff in a tissue, and this happened more than once. These were all terms that one would expect from a seven-year-old. And Lauren Glazer never put words in VA's mouth. She went out of her way to make sure that this was conducted in a professional manner that was consistent with the Child Advocacy Center Act, the protocols. This was a trained professional. And the trial judge viewed the forensic interview, viewed the video, and properly exercised its discretion and found that these statements were admissible. And I would... Why don't you address the sentencing issue regarding Mr. Young's allocution and the court's remarks? Sure. First of all, this was, this issue was also forfeited. Defendant never raised an objection, and he can't satisfy the plain error rule. First of all, I'd like to just briefly point out that as to the predatory criminal sexual assault charge, defendant received a minimum term. He received a six-year sentence. And as to the two criminal... Yes, that's correct. As to D.J., there were two criminal sexual assault counts. Each count had a minimum of four years. He received a five-year sentence on both of those counts. And it's notable that the judge originally had sentenced defendant to ten years on those counts, but actually dropped him down to five years after realizing that those two counts had to run consecutively. So when you look at the total of these three counts, defendant was facing a minimum of 14 years. He actually was sentenced to 16 years. Now, defendant complains about two sentences that the trial court made during the hearing on the motion to reconsider sentence, and that's when the trial court had stated that had you owned it, your sentence would have been somewhat less. Had you told the family, those mothers, that you were sorry, that would have been showing remorse. Well, this court can't view those sentences in isolation. We have to look at everything that occurred during the sentencing hearing and during the hearing on the motion to reconsider sentence. And most notably is defendant's statement in elocution. Of course, he didn't have to speak in elocution. There's no question about that. But he went on to talk about that the victim's testimony was a product of coercion, that the criminal justice system had failed him. He starts making some incoherent statement about not understanding the political corruption that may be involved in this case. And these are all things that the trial court could consider, and that's... Well, is it right for the trial court to consider his belief about how the system is not being fair to him if he really believes he hasn't done it? I mean, a defendant can say nothing, a defendant can say, yeah, I did it, I'm sorry. A defendant can say, yeah, I did it, and I'm not sorry. A defendant can say, I didn't do it, or could say somebody else did it. So if your choice is to say, I didn't do it, and this whole system is rigged against me, why would the judge have to take into account his feelings about how this trial played out? Why is that fair? But, Your Honor, the great thing about elocution is the defendant can say anything. Right. So here the judge is holding against him that he took an opportunity to say whatever he had to say, which is basically, I didn't do it, and the system's not fair. And she's saying, oh, but you didn't show any remorse. Well, he's not showing any remorse because he's saying, I didn't do it. Well, the Illinois Supreme Court has addressed this issue in the ward. And the Illinois Supreme Court has said that defendant has a right to protest his innocence during elocution, but the trial court can make legitimate inferences, including whether defendant is being truthful, as factors bearing on his character and his potential for rehabilitation. As this court knows, the sentencing court can consider all types of factors, defendant's age, his credibility, his demeanor, his character, even his failure to show a penitent spirit. I would submit that applies here. But what's significant here is that we don't have a situation where the trial court said, well, you maintained your innocence, so I'm adding on a certain number of years. That's what happened in the Speed case that defendant cites. That would have been improper, that type of situation. Here we had a trial court that properly exercised its discretion, considered defendant's failure to show remorse, the fact that he never showed any desire to be rehabilitated, never showed any empathy for the harm that he caused the victims, that he caused the family, the trust that he breached to not only the victims, but to the mothers who trust their kids to let them go into his apartment. Okay, and we can certainly all be sorry about what happened to these children, but he's saying he didn't do it. So what would he be sorry for? What would he be apologizing for? If his basic concept is, I didn't do it, why would he show remorse for something that he didn't do, and why would the judge hold it against him that he didn't show remorse for something he's saying he didn't do? How is that right? Your Honor, I would submit that the judge did not hold it against him. The judge formulated it. Had you stood here and owned it, your sentence would have been somewhat less. That's not holding it against him. That's saying that had you expressed remorse. Had you told that family, those mothers, that you were sorry, that would have been showing remorse. But the whole point of his elocution was, I didn't do it. In that situation, the sentence could have been lower, possibly, because the judge was clearly concerned about his potential for rehabilitation. At one point, the judge said that your potential for rehabilitation is great, but when you read her comments in totality, it was clearly contingent on him taking the first step of acknowledging that what he did was wrong. And she said that many times. You have to own it. You're going to have to own what you did one day. What if he didn't do it? What if his belief is that he didn't do it? Why would he say, I did it, and I'm sorry I did it, if he believes he didn't do it? Those two things can't go together. This is a trial court who presided over two trials. Well, she found him guilty. But that doesn't mean that he has to say, I did it. He can still say, I didn't do it. That's absolutely correct, Your Honor. And we don't dispute that. If he says, I didn't do it, then he shouldn't be held accountable for not showing any remorse or apologizing to the families, because he's still saying, I didn't do it. A defendant always has a right to maintain his silence at any stage of the proceedings. Not only silence, but innocence. That's correct. Well, after he's been convicted, he can still say, I didn't do it. He can, yes. But again, the trial court can consider everything in sentencing. It can consider not only the defendant's character and potential for rehabilitation, but it can consider the truthfulness of his statements, even in elocution. And we know this from the Illinois Supreme Court, the case in Ward. And that case provides guidance for this court in reviewing this claim. And I submit that this court should follow the guidance that the Illinois Supreme Court has already set forth in Ward. And she did cut his sentence in half on the motion to reconsider. That's absolutely correct, Your Honor. And when you look at the serious nature of these charges involving a 7-year-old girl who was sexually assaulted multiple times, and a 13-year-old boy who was sexually assaulted, the defendant actually was given quite lenient sentence of only a total of 14 years. That's just two years over the minimum. I'm sorry, 16 years, which is only two years over the minimum of 14 years. All right. Do you want to address the allegations regarding D.J.? Yes. As to D.J., essentially the defendant is asking this court to view the evidence in the light most favorable to the defense. He's essentially suggesting that the state failed to disprove every reasonable hypothesis of innocence, and therefore the evidence was insufficient. But as this court knows, that's not the correct standard of review. This court must view the evidence in the light most favorable to the prosecution. And I just want to address a couple points that counsel pointed out. First of all, as to the phone in the shower. Well, counsel is suggesting that defendant had this portable cell phone in the shower and stayed on the line during the entire sexual assault and didn't end the call until after defendant had anally penetrated him. That was D.J.'s testimony. That he was on the phone when Young came into the bathroom, and that Young started taking pictures of him on his own phone, and that he ended the call because he didn't want the person on the other end to hear what was happening. Yes, that is correct, Your Honor. However, D.J. never specifically stated when he ended the call. He never stated that, I waited for the entire sexual assault and then ended the call. What he did state was, and this was not fleshed out by either party, and the order in which the questions were asked at trial were not necessarily consistent with the chronological order of the events. There were only a couple questions asked about the cell phone. But what we do know is that we have a 13-year-old boy who's visiting defendant's apartment. So it's not unusual for people to bring their cell phone wherever they go, especially a teenager, and here he's taking a shower, so he has the phone in the bathroom. We don't know who initiated the call, but he testifies honestly that, yes, at the beginning I was talking on the cell phone, and he's talking to a girl. We don't know who this girl is, but what we do know is he specifically said, I hung up because I didn't want the girl to know what was going on. Now, the defense is suggesting he should have told this girl what was going on, but we have a 13-year-old boy. That's a possibility, but it appears that he was surprised. He wasn't sure what defendant was going to do. All he knows is all of a sudden he notices defendant is now in the bathroom. His pants are down. He's taking pictures. In D.J.'s words, his penis is hard. So we can make reasonable inferences that since D.J. did not want the other person on the line to hear what was going on, it's reasonable that he would have ended the call sooner rather than later if he didn't want that person to know what was going on. So this is really a red herring designed to distract from what was really going on, and that's the sexual assault. And the defense mentions, well, where are the photos? Where are the defendant's photos, if he was taking photos? Well, defendant was in control of his phone. It's all speculation. We don't even know if there were photos or if defendant deleted them. He wasn't arrested for three days later, so that's all speculation. He talks about, well, where is the evidence of sexual assault when the doctor examined him? The doctor did an external visible exam, and the doctor explained, first of all, it could be consistent with what D.J. said. The doctor explained two reasons. One, not all sexual assaults leave visible trauma, visible evidence of trauma, and two, there could have been internal trauma, internal damage that was not observed during the visible exam. What we do know is D.J. was limping. He was in pain. His mother noticed he was limping, and he explained why. He explained when he made the outcry, because his landlord, someone he trusted, entered the bathroom while he was taking a shower and did several sexual acts, including anally penetrating him. So it's reasonable to infer that, yes, even if there wasn't external visible trauma, D.J. was certainly in pain. I need to ask you to wrap up, Mr. Kelleher. We have another case up this morning. For all these reasons, as well as those in our brief, I would ask that this Court affirm defendant's convictions, as well as his sentence. Thank you. Thank you, Your Honor. Just very briefly, a couple of quick points. D.J. did testify at X-115 in the record that it was after the defendant stuck his penis inside of him that he hung up the phone. So that was his testimony in the record. As far as the forensic interviewer not putting any words in B.A.'s mouth, let's see here, she specifically at one point during the interview said, I heard that Steve may have touched you on your private part with something besides his hand. Was there any other thing that Steve used to do something to your private part? So to me, that's pretty much directly leading her into making that additional accusation. In terms of the court, the sentencing issue, just very briefly, the only reason the court cut Mr. Young's sentence in half was because her original intent had been to sentence him to 10 years for the conduct related to D.J. And it was only after defense counsel pointed out to her, you know, because she said originally it was her understanding that the two counts would merge. And then it was pointed out to her that they would not. And so that's why she then separated them out. And then eventually, after the motion to reconsider, cut it in half, too. You don't disagree that the minimum would have been 14 years? I don't, I don't. And then the last thing, again, just to highlight, you know, the inconsistencies which the State is trying to just have everybody ignore. You know, there are things that B.A. testified to at trial that are incompatible with what she said during her interview. And she specifically stated in her interview that she was not abused in any location within the apartment other than in that front television room, which conflicts with what she testified to at trial. Both cannot be true. I will rest on the rest of the arguments that's made in my brief, and I appreciate the Court's time. Thank you.